**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RIG CONSULTING, INC., | ) | No. 2:23-cv-1286 |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| v. | ) | |
| | ) | |
| DEREK ROGERS, BRIAN M. HANSEL, and DAVID HADAD, | ) | |
| | ) | |
| *Defendants*. | ) | |

## COMPLAINT

Plaintiff RIG Consulting, Inc. ("RIG"), by and through its attorneys, K&L Gates LLP, files this complaint against Defendants Derek Rogers, Brian M. Hansel, and David Hadad (collectively referred to as "Defendants"), stating as follows:

## INTRODUCTION

1.      RIG brings this action against Defendants seeking both monetary damages and permanent injunctive relief barring Defendants from further misappropriating RIG's trade secrets and confidential business information and from continuing their conspiracy to tortiously interfere with RIG's current and prospective contractual relationships and to irreparably injure RIG.

2.      Defendants Rogers, Hansel, and Hadad are all former employees of RIG, a company offering construction management and inspection services. Defendants Rogers and Hansel were employed by RIG for more than twelve years, and Defendant Hadad was employed by RIG for approximately two years. As employees holding key roles at the company, they had access to, and were entrusted with, RIG's highly sensitive, confidential and proprietary business information.

3.     Defendants Rogers and Hansel terminated employment with RIG on December 22, 2022 and January 5, 2023 respectively, and immediately took new positions with RIG's competitor, H.W. Lochner, Inc. ("Lochner").  Upon departing RIG, Defendants Rogers and Hansel made clear their intent to harm RIG, with Defendant Hansel threatening that he would "tear down" the Company.

4.     Defendants Rogers and Hansel have sought to make good on their promise to "tear down" RIG by orchestrating a malicious scheme to harm RIG's standing in the industry and its ability to fulfill its contracts, in turn benefiting their new employer, Lochner.  This scheme includes misappropriating and disseminating RIG's trade secrets (including by downloading and emailing themselves proprietary documents when departing RIG), and interfering with RIG's relationships with its employees and existing and with both its current and prospective clients and partners.

5.     Defendants Rogers and Hansel also recruited Defendant Hadad for their scheme. Defendant Hadad continued to work for RIG until March 31, 2023, when he resigned.  In the months following the departure of Defendants Rogers and Hansel, Defendant Hadad used his access to RIG's IT systems to misappropriate and then destroy critical RIG financial and tax information.  Defendants engaged in this scheme specifically to interfere with RIG's ability to satisfy documentary requirements for government programs in which RIG participates.  Indeed, upon information and belief, after orchestrating this file destruction, Defendants specifically reported RIG to the U.S. Small Business Administration ("SBA") to trigger an audit they knew would require RIG to produce the very documents Defendant Hadad had intentionally destroyed.

6.      Defendants undertook their scheme with the malicious intent of damaging RIG's reputation in the transportation construction industry, interfering with its current and prospective contracts and business relationships, and causing RIG significant financial harm.

7.      As a result of Defendants' unlawful actions, RIG has suffered significant monetary damages and reputational harm.

## PARTIES

8.      RIG Consulting, Inc. is a limited liability company formed under the laws of Pennsylvania with its principal place of business located at 100 Ryan Court, Suite 9, Pittsburgh, Pennsylvania 15205.

9.      Defendant Derek Rogers is an adult individual with a residential address at 331 Cobblestone Circle, McKees Rocks, Pennsylvania 15136.  Defendant Rogers is currently employed by Lochner in its Pittsburgh, Pennsylvania office as a Vice President and Construction Engineering & Inspection ("CEI") Operations Lead.

10.     Defendant Brian M. Hansel is an adult individual with a residential address at 87 Kendrick Road, Houtzdale, Pennsylvania 16651.  Defendant Hansel is currently employed by Lochner in its Pittsburgh, Pennsylvania office as a CEI Manager.

11.     Defendant David Hadad is an adult individual with a residential address at 1500 Center Ave., Apt. 1, New Kensington, Pennsylvania 15068.  Upon information and belief, Hadad is currently employed by Wolf Consulting, LLC as a Service Desk Consultant.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action involves claims arising under federal law, and this Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367 because those

claims form part of the same case or controversy under Article III of the United States
Constitution.

13.     This Court has personal jurisdiction over Defendants because they each reside
within this district.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because
Defendants reside in this district and a substantial part of the events giving rise to this dispute
occurred within this district.

## FACTUAL ALLEGATIONS

### A.  RIG's Business

15.     RIG provides construction inspection and management services for transportation
construction projects in Pennsylvania, Maryland, New Jersey, New York, Ohio, West Virginia,
and Delaware.  RIG regularly acts as either a prime contractor or a subcontractor on various
construction projects, depending on the needs of RIG's customers.  RIG holds contracts in every
District and Central Office of the Pennsylvania Department of Transportation ("PennDOT"), as
well as the Pennsylvania Turnpike Commission, Maryland Department of Transportation
Districts 2, 5, and 7, and with various local and municipal clients.  RIG is both a certified
Disadvantaged Business Enterprise ("DBE") and Woman-Owned Business Enterprise ("WBE"),
as defined by PennDOT.

16.     RIG has cultivated long-standing relationships with its inspectors, its business
partners, and its customers as a result of its demonstrated track record of meeting and exceeding
expectations on its projects.

17.     To develop and maintain this industry advantage, RIG has expended
significant time and resources to develop confidential, proprietary plans, processes, and

4

procedures that ensure quality on its projects and set higher standards than those of its competitors, thereby providing RIG with a competitive advantage when bidding against other inspection companies for projects.

18.     RIG has set forth those plans, processes, and procedures in proprietary documents that identify the unique manner and means in which RIG provides services to its customers, which are critical to RIG winning work.  Consequently, the information reflected in those documents is of significant competitive value in the transportation construction industry.

19.     For example, on projects where RIG has been hired as the prime contractor, RIG develops project-specific Quality Assurance Plans that set forth in great detail the manner and methods RIG uses to complete its work.  These plans employ numerous RIG-developed and RIG-owned trade secrets, including (i) specific tasks performed at a cadence ensuring the achievement of quality goals for a given project; (ii) a specific methodology for collecting external project data and ensuring that such data precisely mirrors internal project office records to facilitate efficient billing; (iii) specific quality control and quality assurance procedures developed by RIG; (iv) detailed processes for internal quality auditing; and (v) project-specific inspection checklists.  These trade secrets are reflected in project-specific documentation provided to its customers only on a need-to-know basis, with the understanding that customers treat the material as confidential, use the documentation only for narrow project purposes, and do not further disseminate it.  As a result, RIG's trade secrets reflected in that project documentation are not generally known in the transportation construction industry.  If obtained by a competitor, this information would effectively provide RIG's competitor with a detailed, step-by-step plan of how to compete against RIG.

20.     RIG also has developed proprietary internal processes for identifying, hiring, and offering to customers the best, most qualified inspectors for a given project, through which RIG has established a comprehensive, confidential database of candidate information.  RIG also expends significant time and resources creating proprietary custom resumes for inspectors in its database to be submitted as part of its bids, which strengthen RIG's candidacy for those projects and confer a competitive advantage upon RIG.

21.     RIG also develops highly confidential, proprietary financial information.  For example, RIG has created confidential Paycheck Protection Program ("PPP") Loan documentation that includes (i) all of RIG's employee wage information and (ii) financial information including tax payments and health insurance payment information.  RIG has also undertaken extensive research regarding the Federal Acquisition Regulations ("FAR") to create a methodology that allows it to accurately project target overhead rates that were critical to RIG's efficient growth.  These methods allow RIG to best utilize its financial resources to create industry-leading benefit and wage programs, and to project gaps in its organizational structure so it can create new positions at RIG and optimize productivity and cash flow.

22.     RIG goes to substantial lengths to protect the confidentiality of its trade secrets, including by (i) developing a secure, password-protected electronic database of all its confidential, trade-secret protected information; (ii) restricting electronic access to proprietary documents to certain subsets of employees on a need-to-know basis; (iii) implementing internal policies and procedures to ensure that only employees who are required to have access to these trade secrets as part of their job duties can access the information, including the installation of physical locks on offices that house hard copies of proprietary, confidential information so that

only those with permission can gain access; and (iv) implementing a Confidential Information Policy in both its Office and Field Employee Handbooks.

23.     RIG's Confidential Information Policy, for instance, explicitly requires employees to safeguard and not disclose RIG's confidential information.  It also specifies that confidential and/or trade-secret protected information will be made available to employees only on a need-to-know basis, and that employees may not disclose confidential information unless required by law or with the explicit approval of RIG's CEO and President, Sharmon Winters ("Ms. Winters").

24.     Upon being hired at RIG, every employee is provided a copy of RIG's Confidential Information Policy and by accepting employment at RIG, agrees to abide by the terms of that policy.

**B. Defendants' Roles at RIG**

25.     Defendant Rogers joined RIG in September of 2010.  Defendant Rogers was employed by RIG for more than twelve years.  Immediately prior to his termination, Defendant Rogers held the executive position of Vice President, in which he was responsible for overseeing the entirety of Construction Management and Inspection operations at RIG.  Defendant Rogers was second-in-charge at RIG behind RIG's CEO.  As such, he was critical to RIG's strategic planning and was responsible for crucial aspects of RIG's operation including client service, project staffing, and managing RIG's staffs of engineers, technical managers, and support personnel.  Defendant Rogers was also deeply involved in RIG's client relations and collaborated regularly with the heads of RIG's Legal Department, Support/Finance Department, and Head of Survey.

26.     Defendant Hansel joined RIG in September of 2010 as a Construction Services Manager.  Defendant Hansel was employed by RIG for more than twelve years.

Immediately prior to his termination, Defendant Hansel held the position of Vice President of Construction Services, in which he acted as RIG's primary client liaison and was responsible for staff retention and development.  Defendant Hansel also oversaw regional project managers and project visits, and actively engaged in generating RIG's proposals, tracking project funding, and overall strategic planning.

27.     Defendant Hadad joined RIG in March of 2021 as an Information Technology Manager and held this position until he resigned.  In his role, Defendant Hadad was responsible for procuring, implementing, and managing the operation of all of RIG's electronic systems and devices, along with ensuring their security, granting and managing access permissions, and handling help-desk questions from RIG employees.  In this role, Defendant Hadad unilaterally controlled permissions for access to RIG electronic systems.

28.     Upon joining RIG, each of the Defendants received a copy of RIG's Confidential Information Policy contained in RIG's Employee Handbook, and by accepting employment with RIG, agreed to abide by its requirements.

29.     Defendants, over the course of their employment with RIG and by virtue of their specific roles with the company, were entrusted with extensive access to RIG's trade secrets and confidential information, as defined by RIG's Confidential Information Policy.

**C.  Defendants' Malicious Scheme to "Tear Down" RIG**

> *a.  Defendants Rogers' and Hansel's Separations and Misappropriation*

30.     On December 22, 2022, a virtual meeting was held between Defendant Hansel, Defendant Rogers, and Ms. Winters regarding personnel matters.  At that meeting, Defendants Rogers and Hansel baselessly accused Ms. Winters of various financial improprieties and ethics violations.

31.     In fact, unbeknownst to RIG at the time, Defendants Rogers and Hansel had already decided to leave RIG's employ and take positions at RIG's direct competitor, Lochner. Immediately following the December 22, 2022 meeting, RIG Human Resources Manager Christina Santillo e-mailed Defendant Hansel, in his capacity as RIG's hiring lead, to ask him which open positions at RIG she should post on Indeed.  Defendant Hansel forwarded that message to Defendant Rogers, and, referring to his own job, typed "Construction Services Director LOL."

32.     Upon information and belief, and as their RIG devices revealed, Defendants Rogers and Hansel had actually been pursuing employment at Lochner for months prior to the December 2022 meeting.

33.     Following Defendant Hansel's deeply unprofessional and threatening behavior during the December 22, 2022 meeting, Ms. Winters called a second meeting that day with Defendant Hansel and Ms. Santillo to discuss his unacceptable behavior.

34.     During that second meeting, Defendant Hansel doubled down on his baseless accusations against RIG and Ms. Winters, verbally resigned from RIG, and stated that he would be providing RIG with a resignation letter.  During that meeting, Hansel also stated his intent to "tear it [RIG] down."

35.     Unbeknownst to RIG at the time, Defendants Rogers and Hansel had already begun to plan their departures from RIG and implement their scheme to "tear down" RIG's business operations and reputation.

36.     For example, several days before the December 22, 2022 meetings, on Sunday, December 18, 2022 between 7:01 AM and 7:49 AM, 64 download events occurred on

Defendant Hansel's Company-provided laptop.  Defendant Hansel correspondingly forwarded to his personal e-mail account the downloaded materials, including:

    a.   At least 47 resumes of RIG employees, which RIG custom prepares on those employees' behalf in order to bid on construction projects;

    b.   At least eight of RIG's Statements of Interest that it provided to PennDOT in confidence for the purpose of bidding on state contracts;

    c.   At least eight of RIG's organizational charts that are provided to PennDOT in confidence for the purpose of bidding on state contracts;

    d.   A packet RIG submitted to PennDOT in connection with its overhead submissions for the 2021 fiscal year, which contained RIG's detailed financial information, including information about how RIG bills for its work, a customer list, and an employee list; and

    e.   A Consultant Quality Plan that RIG submitted to PennDOT that contains trade-secret protected, highly confidential information regarding RIG's methods for providing consultant construction inspection services, including its invoicing procedures, process controls, and internal processes for quality auditing.

37.     Defendant Hansel had no legitimate business reason in his role at RIG to download and access those materials at that time, nor did he have any legitimate reason to email copies of those proprietary documents to his personal email account.

38.     On December 23, 2022—just one day after Defendants Hansel and Rogers met with Ms. Winters and Defendant Hansel resigned from RIG—Defendant Rogers inserted a USB SanDisk Cruzer Snap USB device into his Company-provided laptop.  Rogers then moved

multiple files from his Company-provided laptop onto that USB device, into a subfolder entitled D:\Personal\Videos\Forms\Inspector Resumes.  Rogers additionally accessed files or folders named "9-9-22" and "Contacts" on the same date and around the same time that the USB device was connected to his Company-provided laptop.

39.     Defendant Rogers had no legitimate business reason to transfer RIG's materials onto a personal USB device.

40.     Defendants Rogers and Hansel obtained RIG's trade secrets and confidential information while they were executives at RIG, and were granted access to that information for the limited purpose of performing their duties at RIG.  Defendants Rogers and Hansel knew that their unauthorized accessing of that information for purposes other than the performance of their duties for RIG and their transmission of documents from RIG's system to either their personal email accounts or personal USB devices was in direct violation of RIG's Confidential Information Policy.

41.     Subsequently, on December 24, Defendant Hansel purported to rescind his resignation via e-mail, but continued to launch baseless accusations against RIG.  In response, RIG notified Defendant Hansel that it considered his voluntary and unequivocal resignation of December 22, 2022 to be effective.

42.     Just a few days later, on December 27, Defendant Rogers sent approximately 3,600 files on his Company-provided laptop to the Recycle Bin.  The following day, Defendant Rogers sent another approximately 2,400 files to the Recycle Bin.

43.     Then, on December 28, when Defendant Rogers and Ms. Winters were scheduled to meet to continue the discussion they began on December 22, Defendant Rogers failed to report for work but continued his barrage of baseless accusations against RIG via email.

44.      Consequently, given Defendant Rogers' failure to perform his job duties, on December 28, RIG instructed Defendant Hadad, then still employed at RIG as IT Manager, to suspend Defendant Rogers' access to his RIG Microsoft 365 account.  That same day, Defendant Rogers' company-provided laptop was reset in a manner that wiped the user profile data from the computer, significantly limiting visibility into actions taken on Defendant Rogers' laptop prior to that system reset.  Upon information and belief, either Defendant Hadad or Defendant Rogers performed this reset, with the specific purpose of destroying evidence of wrongdoing.  RIG did not issue any instruction or request that Defendant Rogers' company-provided laptop be reset in this manner, nor is such a reset standard procedure, most especially when someone remains employed by RIG.

45.      On January 5, 2023, due to Defendant Rogers' continued refusal to report to work or perform his duties, RIG terminated Defendant Rogers' employment.

   *b. Defendants Rogers' and Hansel's Post-Employment Misappropriation and Interference*

46.      On January 9, 2023, Defendants Rogers and Hansel announced that they were starting their new positions at Lochner via their public LinkedIn accounts.

47.      Defendants Rogers and Hansel perform substantially the same work for Lochner that they did for RIG, as they have started at Lochner a local construction inspection division that is now competing directly with RIG in the Commonwealth of Pennsylvania.

48.      On January 31, 2023, in a release titled "Lochner Expands in Pennsylvania," Lochner announced that Rogers and Hansel were joining Lochner and touted their "extensive experience in construction inspection."  In that release, Lochner explained that Rogers and Hansel "will play a vital role in driving business development with existing and new clients and

in growing [Lochner's] inspection staff size and capabilities across Pennsylvania and beyond."
A true and correct copy of that release is attached hereto as Exhibit A.

49.      Tellingly, Defendant Hansel was using his Company-provided laptop to visit
Lochner's website as early as September 1, 2022, months before he began hurling baseless
accusations at RIG and before he resigned from RIG.

50.      Indeed, Defendant Hansel corresponded via email with Ryan Gargan, a Vice
President and Northeast Regional Manager for Lochner in Pittsburgh, on December 22, 2022—
the same day that Defendant Hansel resigned from RIG.  Upon information and belief,
Defendant Hansel now reports to Mr. Gargan in his new position at Lochner.

51.      Upon information and belief, Defendants Rogers and Hansel obtained RIG's
trade-secret-protected information for the purposes of competing with RIG at Lochner and
undermining both RIG's business operations and its reputation in the transportation construction
industry, for their benefit and that of their new employer.

52.      Indeed, the efforts of Defendants Rogers and Hansel to misappropriate RIG's
information did not end with their departures from RIG.  Defendants Rogers and Hansel
subsequently contacted RIG's then-Director of Finance and Administration, James Wachner, in
an effort to improperly solicit even more of RIG's confidential financial information.

53.      Since their coordinated departures from RIG, Defendants Rogers and Hansel
have turned to deploying the misappropriated trade secret information in an extensive, malicious
smear campaign designed to undermine RIG's business.

54.      Using their access to RIG's proprietary inspector roster, employee list, and
resumes, Defendants Rogers and Hansel have contacted at least a dozen of RIG's employees in
an effort to persuade them to leave RIG's employ by making false and misleading claims that

RIG is financially unstable, that it is going out of business, and that the employees' jobs are at risk.

55.     RIG learned of Defendants' efforts to divert RIG's employees directly from the very employees that Defendants Rogers and Hansel contacted, multiple of whom have left RIG's employ and, during exit interviews, referenced the impact of the statements from Defendants Rogers and Hansel.

56.     Defendants Rogers and Hansel have successfully diverted employees from RIG to transfer to RIG's market competitors, including both to Lochner and to Foresight Construction Services, LLC, a company owned by Defendant Rogers' long-time live-in girlfriend, Margaret Talarico.

57.     Defendants Rogers' and Hansel's malicious and underhanded diversion of RIG's employees has made it substantially harder for RIG to appropriately staff its existing projects and to bid on future projects, which has negatively impacted RIG's existing and prospective business.

58.     Upon information and belief, through wrongful access to RIG's customer list, Defendants Rogers and Hansel have also contacted numerous RIG customers to provide them with the same false and misleading narrative regarding RIG that Defendants Rogers and Hansel provided to RIG's employees.

59.     As a direct result of Defendants Rogers' and Hansel's market interference, RIG has, in recent months, faced an unprecedented spate of increased, uncharacteristic, and non-market demands from its clients.  Those clients, in turn, have used any supposed deficiencies in RIG's response to their unreasonable, and even impossible, demands as a basis to cut back RIG's work or otherwise substantially burden RIG's performance of contracted-for services.

60.     RIG has lost work on contracts as a result of Defendants Rogers' and Hansel's interference.  For example, RIG's contract was terminated on a project after a RIG inspector abruptly resigned.  Upon exiting RIG, that employee informed RIG that she had been contacted by Defendants Rogers and Hansel on multiple occasions, with both Defendants Rogers and Hansel fabricating claims that there would be no work available for her by the end of 2023 if she were to stay at RIG.

61.     Defendants Rogers and Hansel undertook their actions with the specific intent of interfering with RIG's ability to perform on its current and prospective contracts.

   c.   *Defendants Rogers and Hansel Refuse to Engage with RIG Regarding RIG's Concerns*

62.     In May of 2023, RIG sent letters to Defendant Hansel's and Defendant Rogers' attorneys, objecting to Defendants Rogers' and Hansel's unlawful activity and demanding that it cease and desist.  True and correct copies of these letters are attached hereto as Exhibit B.

63.     Defendant Hansel's attorney briefly responded to RIG's letter via e-mail but did not, despite the specific invitation to do so, substantively address RIG's concerns, let alone provide any assurance that Defendant Hansel would cease his unlawful behavior.

64.     Defendant Rogers has not responded to RIG's letter in any fashion whatsoever.

65.     Additionally, on June 16, 2023, RIG contacted Lochner to notify it of its new employees' misappropriation of RIG's trade secrets and confidential information, and to seek assurances from Lochner that it would not countenance such unlawful behavior from its employees.  A true and correct copy of this letter is attached hereto as Exhibit C.

66.     To date, RIG has received no response from Lochner.

        d.   *RIG is Selected for Audit and Discovers the Destruction of its Financial Documents.*

67.      On June 22, 2023, RIG was informed that it was selected for an audit by the SBA, pursuant to which it was required to provide certain financial documentation to the SBA within three business days.

68.      In January 2023, Defendant Hansel's attorney had threatened to report RIG for an audit.  Upon information and belief, Defendant Hansel made good on his threat, and Defendants triggered the SBA audit by reporting RIG to the SBA.

69.      When RIG went to gather the financial documentation required for the audit, it discovered that the required documentation had been permanently deleted from RIG's internal database.

70.      Specifically, RIG discovered that at the end of March 2023, Defendant Hadad, just days prior to departing RIG, caused the permanent deletion of over 800 items from RIG's OneDrive folder titled "accounting," including files reflecting RIG's trade secret financial information.

71.      As an IT Manager, Defendant Hadad did not have any legitimate purpose to access these accounting documents, nor was he authorized to view them on a need-to-know basis.  Indeed, he had no involvement with RIG's financial data or decision-making whatsoever. Defendant Hadad only obtained access to these documents by virtue of his position as an IT Manager, which gave him the ability to grant himself access to portions of RIG's systems.

72.      Although Defendant Hadad remained employed by RIG until March 31, 2023, subsequent analysis of Defendant Hadad's Company-issued laptop revealed that Defendant Hadad was applying for jobs elsewhere as early as January 9, 2023, around the time of Defendants Rogers' and Hansel's coordinated exit from RIG.

73.      Upon his exit, Defendant Hadad took purposeful steps to permanently erase files saved to his RIG account.  By way of example, Defendant Hadad destroyed the "profile folders" that are created automatically under a user's profile when a user first logs into a computer, such as the "Desktop," "Documents," and "Pictures" folders.  Defendant Hadad also deleted the standard artifacts used to determine which files and folders were opened on his computer, as well as his internet history and other activity.  Such deletions are highly unusual and represent an extreme step to erase one's work history and work product.

74.      On March 31, 2023—Defendant Hadad's last day of employment at RIG—he logged off of his assigned account, then, seconds later, logged back into the computer under an administration account called "rigadmin".  Defendant Hadad only had access to this administration account by way of his position as RIG's IT Manager.  Defendant Hadad then performed an internet search for the phrase "delete accounts."  Through improper use of administrator access, Defendant Hadad proceeded to delete his profile on his computer, erasing a multitude of documents and information.

75.      During the last weeks of Defendant Hadad's employment, he also inserted two storage devices into his RIG-issued computer: one 320 Gigabyte hard drive, and one 14.3 Gigabyte USB drive.

76.      Most disturbingly, Defendant Hadad also utilized his permissions as an IT Manager to access RIG's critical accounting documents, remove copies to a personal folder, and then change the applicable settings on RIG's accounting folder to cause the documents' automated deletion.  Upon information and belief, Hadad did so at the request of and/or in concert with Defendants Rogers and Hansel.  As a result of Defendants' actions, RIG has

incurred substantial costs in attempting to restore and otherwise recover the critical financial information that Defendant Hadad destroyed.

**COUNT I**
**Federal Defend Trade Secrets Act (18 U.S.C. § 1836 *et seq.*)**
*All Defendants*

77.     RIG repeats and re-alleges each and every paragraph above as if fully set forth herein.

78.     This claim arises under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, ("DTSA") which prohibits the misappropriation of trade secrets.

79.     RIG uses its trade secret information to bid on transportation projects in Pennsylvania, Maryland, New Jersey, New York, Ohio, West Virginia, and Delaware; thus, this information is related to services used in, or intended for use in, interstate commerce.

80.     RIG's confidential information regarding its policies, processes, and procedures for project performance, including but not limited to quality assurance, its roster of inspector candidates, its custom inspector resumes, its customer list, and its internal financial data is entitled to trade secret protection under the DTSA, which allows an owner of trade secrets to recover damages for the misappropriation of its trade secrets.

81.     RIG has invested and continues to invest substantial time, resources, and expense into developing its proprietary business information in order to maintain its competitive position in the market.

82.     This information confers a competitive advantage upon RIG in the construction inspection industry, including as against competitors such as Lochner.  The confidential nature of RIG's trade-secret-protected proprietary business information is critical to its long-term success.

83.     RIG takes reasonable measures to protect the secrecy of its trade secrets, including by:  (i) developing a secure, password-protected electronic database of its confidential, trade-secret protected information; (ii) restricting electronic access to proprietary documents to certain subsets of employees on a need-to-know basis; (iii) implementing internal policies and procedures to ensure that only employees who are required to have access to these trade secrets as part of their job duties can access the information; and (iv) implementing a Confidential Information Policy in both its Office and Field Employee Handbooks.  RIG expends substantial time and expense to develop and deploy these protections.

84.     The transportation construction industry as a whole considers the type of proprietary business information at issue here to be trade secret protected.

85.     RIG uses its proprietary, trade secret-protected business information to win bids to contract with various state and local governments to perform construction inspection services.  As such, the information has independent economic value to RIG.

86.     The information likewise would have independent economic value for competitors if they were to obtain this trade secret-protected information, as it would allow competitors to undercut RIG by negotiating with both governmental entities and prime contractors knowing the information provided by RIG in its bids, or to use and deploy RIG's high-performing policies, practices, and procedures in its own bids to compete with RIG.

87.     RIG's trade secret-protected information is not generally known to the public or readily accessible by the public using proper means.

88.     RIGs trade secret-protected information derives independent value from not being generally known to the public or readily accessible by the public using proper means.

89.      While employed at RIG, Defendants knowingly misappropriated RIG's trade secrets in direct violation of RIG's Confidential Information Policy and their confidentiality obligations to RIG as employees and executives.

90.      Defendants knew that the documents they misappropriated from RIG contain trade secret-protected information, because (a) they were executives or employees at RIG who were on notice that the materials were confidential, (b) they had received and agreed to abide by RIG's Confidential Information Policy, and (c) they were aware of the extensive measures taken by RIG to protect that information from disclosure.

91.      RIG has never consented to or authorized Defendants to acquire RIG's trade secrets in the manner in which they did, nor to use, disseminate, or destroy the improperly obtained, trade secret-protected information.

92.      Defendants willfully and maliciously misappropriated RIG's trade secret-protected information by unlawfully acquiring it in breach of their duty to maintain its secrecy.

93.      Defendants Rogers and Hansel willfully and maliciously misappropriated RIG's trade secret-protected information by using it to tortiously interfere with RIG, facilitating their new employer Lochner's direct competition with RIG and generally devaluing RIG's reputation in the industry.

94.      Defendant Hadad also willfully and maliciously misappropriated RIG's trade-secret protected information by unlawfully acquiring RIG's trade-secret protected, proprietary information in order to destroy that information.

95.      Defendants, therefore, have misappropriated RIG's trade secrets in violation of the DTSA.

96.     Defendants' misappropriation of RIG's trade secret-protected information has caused RIG harm by depreciating the independent economic value of RIG's trade secret-protected information attributable to the secrecy of such information, depriving RIG of its trade-secret protected information and thereby requiring RIG to reconstruct that information at great expense, and causing lost business.

97.     As a direct and proximate result of Defendants' improper conduct, RIG has sustained damages and losses in an amount to be determined at trial.

98.     RIG is entitled to damages pursuant to the DTSA, including its costs, attorneys' fees, and exemplary damages.

99.     Defendants' acquisition and/or use of RIG's trade secrets has caused and will continue to cause RIG irreparable harm.  Unless permanently enjoined, Defendants' misappropriation, as alleged herein, will continue to cause RIG irreparable harm, loss, and injury.

## COUNT II
### Pennsylvania Uniform Trade Secrets Act (12 Pa. C.S.A. § 5301 *et seq.*)
*All Defendants*

100.     RIG repeats and re-alleges each and every paragraph above as if fully set forth herein.

101.     RIG's confidential information with respect to its policies, processes, and procedures for project performance, including but not limited to quality assurance, its roster of inspector candidates, its custom inspector resumes, its customer list, and its internal financial data is entitled to trade secret protection under the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S.A. § 5301, *et seq.*, ("PUTSA"), which allows an owner of trade secrets to recover damages for the misappropriation of its trade secrets.

102.     RIG has invested and continues to invest substantial time, resources, and expense into developing its proprietary business information in order to maintain its competitive position in the market.  Due to the time, resources, and expense used to develop this business information, the confidential information would be difficult for others to acquire or duplicate using proper means.

103.     RIG takes reasonable measures to protect the secrecy of its trade secrets, including by:  (i) developing a secure, password-protected electronic database of all its confidential, trade-secret protected information; (ii) restricting electronic access to proprietary documents to certain subsets of employees on a need-to-know basis; (iii) implementing internal policies and procedures, including physical restrictions, to ensure that only employees who are required to have access to these trade secrets as part of their job duties can access the information; and (iv) implementing a Confidential Information Policy in both its Office and Field Employee Handbooks.  RIG expends substantial time and expense to develop and deploy these protections.

104.     RIG uses its proprietary, trade secret-protected business information to win bids to contract with various state and local governments to perform construction inspection services.  As such, the information has independent economic value to RIG.

105.     The information likewise would have independent economic value for competitors if they were to obtain this trade secret-protected information, as it would allow competitors to undercut RIG by negotiating with both governmental entities and prime contractors knowing the precise information provided by RIG in its bids, or to use and deploy high-performing policies, practices, and procedures in its own bids to compete with RIG.

106.     RIG's trade secret-protected information is not generally known to the public or readily accessible by the public using proper means.

107.     While employed at RIG, Defendants knowingly misappropriated RIG's trade secrets in direct violation of RIG's Confidential Information Policy and their confidentiality obligations to RIG as employees and executives.

108.     RIG has never consented to or authorized Defendants to acquire RIG's trade secrets in the manner in which they did, nor to use, disseminate, or destroy the improperly obtained, trade secret-protected information.

109.     Defendants willfully and maliciously misappropriated RIG's trade secret-protected information by unlawfully acquiring it in breach of their duty to maintain its secrecy.

110.     Defendants Rogers and Hansel willfully and maliciously misappropriated RIG's trade secret-protected information by using the information to tortiously interfere with RIG, facilitating their new employer Lochner's direct competition with RIG and generally undercutting RIG's reputation in the industry.

111.     Defendant Hadad also willfully and maliciously misappropriated RIG's trade-secret protected information by unlawfully acquiring RIG's trade-secret protected, proprietary information in order to destroy that information.

112.     As a direct and proximate result of Defendants' improper conduct, RIG has sustained damages and losses in an amount to be determined at trial.

113.     RIG is entitled to damages pursuant to the PUTSA, including its costs, attorneys' fees, and exemplary damages.

114.     Defendants' acquisition and/or use of RIG's trade secrets has caused and will continue to cause RIG irreparable harm.  Unless permanently enjoined, Defendants'

misappropriation, as alleged herein, will continue to cause RIG irreparable harm, loss, and injury.

**COUNT III**
**Unauthorized Access in Violation of Computer Fraud and Abuse Act (18 U.S.C. § 1030)**
*Defendant Hadad*

115.     RIG repeats and re-alleges each and every paragraph above as if fully set forth herein.

116.     Upon information and belief, during his employment, Defendant Hadad exceeded his authorization in accessing RIG's protected computer and network systems, which were used in interstate commerce.

117.     Defendant Hadad used RIG's computer and network systems and his Company-owned laptop to gain access to and destroy RIG's confidential financial and tax records for his own personal benefit and/or for the purpose of causing harm to RIG.

118.     RIG's policies and practices did not permit Defendant Hadad to engage in the conduct described above, and by doing so, Defendant Hadad breached RIG's policies and practices.

119.     Defendant Hadad's actions caused in excess of $5,000 in damages to RIG, which was forced to expend significant resources in attempting to restore access to destroyed files and otherwise deal with the negative impacts of the file destruction.

120.     As the direct and proximate result of Defendant Hadad's actions, as described above, RIG has been severely injured and harmed.

**COUNT IV**
**Civil Conspiracy**
*All Defendants*

121.    RIG repeats and re-alleges each and every paragraph above as if fully set forth herein.

122.    Defendants combined or agreed with intent to do unlawful acts or to do otherwise lawful acts by unlawful means, namely to "tear down" RIG by (a) misappropriating its trade secret-protected information, (b) tortiously interfering with RIG's contracts and business relationships, and (c) destroying RIG's financial and tax information so that it would be unavailable in the event that RIG was audited.

123.    Defendants combined and conspired with the intent to injure RIG.

124.    Defendants performed overt acts in furtherance of this combination, as set forth herein.

125.    RIG has been harmed by Defendants' unlawful combination and has suffered damages.

126.    Defendants' actions, as alleged herein, were committed with reckless indifference to the rights of RIG, and with either specific intent to cause harm to RIG, or with reckless disregard as to whether such actions would cause harm to RIG.  Thus, Defendants' acts in furtherance of their conspiracy warrant punitive damages.

**COUNT V**
**Tortious Interference with Existing Contractual Relations**
*Defendants Rogers and Hansel*

127.    RIG repeats and re-alleges each and every paragraph above as if fully set forth herein.

128.    RIG has valid and enforceable contractual relationships with its customers to provide construction inspection and related services on various projects.  Defendants Rogers and

Hansel were aware of those relationships by virtue of their positions with RIG and their misappropriation of RIG's Quality Assurance Plans, inspector roster, employee list, and other confidential materials.

129.     Defendants Rogers and Hansel targeted RIG's employees for interference, knowing those employees are critical to RIG's ability to fulfill its contracts with its customers and that disruption to RIG's workforce would seriously jeopardize RIG's business.

130.     Defendants Rogers and Hansel intentionally interfered with the contractual relationships between RIG and its customers when Defendants Rogers and Hansel—using their misappropriated information—contacted RIG's employees and induced them to leave RIG's employ by falsely claiming that RIG was unstable, that it was going out of the business, and that their jobs at RIG were at risk.  The induced departures of RIG's employees in turn hampered RIG's ability to perform under its contracts with customers and resulted in the termination of certain contracts with its customers.

131.     In so interfering, Defendants Rogers and Hansel have acted and continue to act without any privilege or justification.

132.     Defendants Rogers and Hansel acted and continue to act wrongfully and with the intent of harming RIG by intentionally interfering with RIG's contractual relationships with its customers.

133.     Defendants Rogers' and Hansel's intentional interference has caused numerous RIG employees to leave RIG's employ, thereby hampering RIG's ability to fulfill the obligations it has incurred in it contracts with its customers, and causing RIG'scustomers to terminate their contracts with RIG.

134.     As a direct and proximate cause of Defendants Rogers' and Hansel's improper conduct, RIG has sustained damages and losses in an amount to be determined at trial.

## COUNT VI
## Tortious Interference with Prospective Contractual Relations
*Defendants Rogers and Hansel*

135.     RIG repeats and re-alleges each and every paragraph above as if fully set forth herein.

136.     RIG's business requires it to submit bids to state governments and to local municipalities to act as the prime contractor or subcontractor on those parties' transportation construction projects.

137.     RIG's ability to obtain these contracts is dependent on its reputation for reliability in the transportation construction industry and its ability to adequately staff its projects.

138.     Based on RIG's history with its customers, which reflects a high win-rate on bids RIG makes to state and municipal entities, there is a high probability that RIG's customers would have awarded RIG certain work but for Defendants Rogers' and Hansel's interference.

139.     Defendants Rogers and Hansel intentionally interfered with RIG's prospective contractual relationships by making false and misleading claims to both RIG's employees and its customers that RIG is financially unstable, that it is going out of business, and that RIG's employees' jobs and customers' projects are at risk.

140.     Defendants Rogers and Hansel have demonstrated their desire and intent to prevent RIG from being awarded state and local construction contracts, and either knew or should have known that interference with RIG's prospective contractual relations was substantially likely to occur as a result of their tortious conduct.

141.    But for Defendants Rogers' and Hansel's intentional interference, RIG would have been awarded certain contracts with certain customers that in fact were not awarded.

142.    Defendants Rogers and Hansel intentionally interfered with the prospective contractual relationships between RIG and its customers with the intent of harming RIG.

143.    Defendants Rogers and Hansel are not privileged or justified in their interference with RIG's prospective contractual relationships.

144.    As a direct and proximate cause of Defendants Rogers' and Hansel's improper conduct, RIG has sustained damages and losses in an amount to be determined at trial.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court issue a judgment in its favor and enter an order:

(i)    Permanently enjoining Defendants from misappropriating RIG's trade secret-protected information and tortiously interfering with RIG's existing and prospective contractual relationships;

(ii)    Awarding to RIG any and all monetary damages sustained as a result of Defendants' unlawful actions described in the Complaint, including actual, consequential, special, exemplary, treble, and punitive damages, lost profits, loss of business expectancy, and disgorgement of Defendants' profits;

(iv)    Awarding to RIG the cost of the suit, including attorneys' fees, as well as pre- and post-judgment interest; and

(v)    Such other relief as the Court deems to be fair and appropriate.

Dated: July 14, 2023

/s/ David J. Garraux
David J. Garraux (PA ID No. 204350)
Anna Shabalov (PA ID No. 315949)
Kira M. Geary (PA ID No. 330334)
**K&L Gates LLP**
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222

Tel: (412) 355-6500
david.garraux@klgates.com
anna.shabalov@klgates.com
kira.geary@klgates.com

*Attorneys for Plaintiff RIG Consulting, Inc.*